UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


DESIMONE HOSPITALITY SERVICES, LLC,

      Plaintiff,

v.                         Lead Civil Action No.: 2:14-14845

WEST VIRGINIA-AMERICAN WATER COMPANY,

      Defendant.


<u>MEMORANDUM OPINION AND ORDER</u>


      Pending is plaintiffs' consolidated objection to removal and for remand, filed May 30, 2014.


I.


      Freedom Industries, Inc. ("Freedom") is a West Virginia corporation engaged primarily in the production of specialty chemicals for the mining, steel, and cement industries.  It is also a leading supplier of freeze conditioning agents, dust control palliatives, flotation reagents, water treatment polymers, and other specialty chemicals.

On January 9, 2014, approximately 300,000 residents in the Charleston and surrounding areas suffered an interruption in their water supply.  The interruption was caused by a spill into the Elk River of a coal processing chemical mixture sold and distributed exclusively by Eastman Chemical Company.  The mixture was at the time being stored in a facility owned and operated by Freedom Industries, Inc. ("Freedom").

The chemical that leaked, 4-methylcyclohexane methanol, along with other chemicals, is commonly referred to as "Crude MCHM."  Crude MCHM infiltrated the water treatment plant in Charleston operated by West Virginia American Water ("WV American").  On January 17, 2014 ("Petition Date"), Freedom petitioned in this district for relief under Chapter 11 of title 11 of the United States Code.

On the Petition Date, approximately twenty-eight (28) lawsuits naming Freedom as a defendant were pending in state and federal district court.  A host of additional tort actions were thereafter filed in state and federal court against Freedom, WV American and other defendants.  There are also approximately 3,800 spill-related claims filed in the main bankruptcy case, totaling roughly $76,000,000.  The spill claims include the contingent unliquidated inchoate contribution claims filed by WV American and its accompanying claim for over $1 million in

2

property damage and associated expenses incurred to replace the
granular activated carbon media in its 16 water treatment
filters.

     The factual allegations in the aforementioned civil
actions arise from the chemical spill.  All parties appear to
agree that the consolidated cases in this action harbor claims
that consist of one or more of four categories as follows: (a)
physical personal injury tort claims, such as bodily injury,
emotional distress and/or requests for medical monitoring to
detect bodily injury in the future; (b) non-physical personal
injury tort claims, such as annoyance, loss of enjoyment,
nuisance and inconvenience; (c) property-related claims, such as
trespass, property damage, and loss of use of property; and (d)
financial claims, such as lost income or loss-of-business
claims.

     On February 21 and 22, 2014, Freedom removed the
consolidated actions in which it was named a defendant.  On
February 24, 2014, WV American did likewise in actions in which
it was named but Freedom was not.  These two removals resulted
in 57 cases being referred to the bankruptcy court.  The basis
for the removals was that the actions were putatively "related
to" Freedom's bankruptcy proceeding pursuant to 28 U.S.C. §§
1334 and 1452 and Local Bankruptcy Rule 9027-1.

On April 16, 2014, the court withdrew on a limited basis the references of the consolidated cases.  On April 18, 2014, the court formalized the consolidation for purposes of briefing and resolving the motions to remand that pend therein. The case of Desimone Hospitality Services v. West Virginia American Water Company, civil action 2:14-14845, was designated as the lead case.

Respecting the Chapter 11 proceeding, approximately 80 claims were filed in the main bankruptcy case that do not relate to the chemical spill.  They total approximately $7,500,000. Additionally, one secured claim in the approximate amount of $500,000 exists, along with estimated priority claims of $450,000.  The West Virginia Department of Environmental Protection ("WVDEP") asserts an unliquidated administrative expense claim, and several bankruptcy court approved professionals assert administrative claims for fees and expenses incurred in the Freedom bankruptcy case.

Freedom maintained two insurance policies that provided potential coverage for the chemical spill.  Both policies were issued by AIG Specialty Co. or its affiliated entities ("AIG").  A dispute developed between Freedom and AIG concerning the extent of coverage.  On March 29, 2015, the

4

bankruptcy court approved a settlement, over objection by Gary Southern, requiring that $2.9 million in proceeds from the insurance policies be used only for the purpose of paying liabilities from or related to the chemical spill and related costs.  Both Mr. Southern and Freedom appealed the order.  These appeals have since been dismissed by agreement.

On April 3, 2015, the bankruptcy court granted reconsideration of the March 29, 2015, order to clarify that the WVDEP would be entitled to priority status with respect to Freedom's environmental obligations arising from the chemical spill.

On August 7, 2015, Freedom filed a second amended plan of liquidation, disclosure statement and summary, aimed at incorporating revisions directed by the bankruptcy court on July 28, 2015.  On August 12, 2015, Freedom filed a third amended disclosure statement and plan of liquidation.  On August 26, 2015, the bankruptcy court approved the third amended disclosure statement.  The August 12, 2015, proposals reflected multiple settlements enabling the Freedom estate to distribute approximately $6.1 million to its creditors.  The failure of any single settlement would produce infeasibility.  The funding sources for the plan are as follows: (1) the approximately $2,720,000 of funds remaining in the escrow accounts established

in connection with the acquisition of Freedom by a company called Chemstream, (2) the proceeds of a settlement with Gary Southern (totaling $300,000); and (3) the proceeds of the AIG settlement ($3,280,490.87).  Chemstream has since made, <u>inter alia</u>, a contribution of $1,100,000 to the Freedom estate to fund the actual costs of remediating a Freedom site known as the Etowah River Terminal.  The major bankruptcy case constituents supported the third amended plan.  Claims will be treated as follows:

> Class 3 — <u>Trade Claims</u>. Trade claims will receive a pro rata share of $350,000 cash on the plan effective date, plus 50% of any amounts recovered through estate causes of action.

> Class 4 — <u>Convenience Chemical Spill Claims</u>. All claimants holding allowed proofs of claims for chemical spill damages below $3,000 are referred to as "Convenience Spill Claims." Allowed Convenience Spill Claims are entitled to a <u>pro rata</u> share of $500,000 to be paid as soon as practicable after the plan effective date.

> Class 5 — <u>Spill Claims</u>. All allowed Chemical Spill claims, other than Convenience Spill Claims, will

receive a _pro_ _rata_ share of $1,470,983, plus 50% of
any amounts recovered through estate causes of action.

Claims administrators and a Spill Claim Oversight
Committee will determine how funds will be used or distributed.
Distributions will not be made to Class 5 claimants until their
claims have been estimated.  On October 6, 2015, the bankruptcy
court approved the plan.

None of the plaintiffs' claims, WV American's
contribution claims, or WV American's claim for damages to its
filters have been allowed, compromised, objected to, disallowed
or estimated.  It is anticipated that, post-confirmation, the
claims administrators may attempt to settle all claims or object
to any improper or inflated claims.  The process could take
months.

All non-Convenience Spill Claims filed by the
plaintiffs in the chemical spill lawsuits fall into Class 5, as
do WV American's filter damage and inchoate contribution claims.
No claims in Class 5 have been disallowed, compromised, or
allowed but apparently remain subject to the claims resolution
process.  There are no claims against Freedom expected to pass
through the main bankruptcy case.  Nothing in the plan documents
diminishes or stays the rights of any party to seek to allocate

or apportion liability against Freedom in any lawsuit or to claim a verdict credit for any sums paid by Freedom to a holder of a Chemical Spill Claim.

It is expected that there will be objections to WV American's contribution claims, which will need to be resolved before any significant distribution to Class 5 claimants.  WV American is expected to contend that those contribution claims cannot be resolved until a resolution of the Desimone cases and the Good class action pending in this court.  Plaintiffs intend to seek disallowance of WV American's contribution claim.

II.

A.   Subject Matter Jurisdiction

28 U.S.C. § 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. § 1452(a), a venue statute, provides further as follows:

> A party may remove any claim or cause of action in a
> civil action . . . to the district court for the
> district where such civil action is pending, if such
> district court has jurisdiction of such claim or cause
> of action under section 1334 of this title.

28 U.S.C. § 1452(a).

The defendant contends that removal of these cases was proper inasmuch as each case is "related to" a case under title 11, namely, the Freedom bankruptcy.  Plaintiffs concede those cases in which Freedom is a party defendant qualify as "related to" cases.  They challenge that same basis, however, for exercising removal jurisdiction over cases naming only WV American as a defendant.  They assert that the contingent, inchoate contribution claims alleged by WV American, which are the subject of the claims process in the Freedom bankruptcy, are insufficient to support "related to" jurisdiction.

A review of the relevant cases shows that courts considering the scope of "related to" jurisdiction over actions against non-debtors, such as WV American, have, for the most part, limited it to the following circumstances:

1.   Where the non-debtor defendant has joined the debtor in bankruptcy as a third party defendant in the action.  See, e.g., Pacor, Inc. v. Higgins, 743 F.2d 984 (3rd Cir. 1984), overruled in part on other grounds by Things Remembered, Inc. v. Petrarca, 516 U.S. 124, 124-25 (1995).

2.   Where the non-debtor defendant has a contractual indemnity agreement with the debtor

9

in bankruptcy under which the debtor's
liability is deemed automatic.  See, e.g., In
re Celotex Corp., 124 F.3d 619 (4th Cir. 1997).

WV American's inchoate contribution claims against
Freedom do not fall into either of these categories.

The leading case on "related to" jurisdiction is
Pacor, Inc. v. Higgins.  In Pacor, the Third Circuit first noted
that the "usual articulation of the test for determining whether
a civil proceeding is related to bankruptcy is whether *the
outcome of that proceeding could conceivably have any effect on
the estate being administered in bankruptcy*."  743 F.2d at 994
(emphasis in original) (citations omitted).  The court then
expanded on this traditional conceivability test, declaring that
"[a]n action is related to bankruptcy if the outcome could alter
the debtor's rights, liabilities, options, or freedom of action
(either positively or negatively) and which in any way impacts
upon the handling and administration of the bankrupt estate."
Id.  Applying this standard, the Pacor court held that a suit
against a non-debtor was not "related to" a bankruptcy where "it
is a mere precursor to the potential third party claim for
indemnification" against the debtor and "would in no way bind
[the debtor]" who "would still be able to relitigate any issue,

10

or adopt any position, in response to a subsequent claim" by the non-debtor.  <u>Id.</u> at 995.

The Supreme Court endorsed the <u>Pacor</u> standard for relatedness jurisdiction in <u>Celotex Corp. v. Edwards</u>, approving both the Third Circuit's articulation of the comprehensive scope of bankruptcy jurisdiction and its acknowledgement that "a bankruptcy court's 'related to' jurisdiction cannot be limitless."  514 U.S. 300, 308 (1995) (citations omitted).  The Court also observed that:

> The First, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, and Eleventh Circuits have adopted the <u>Pacor</u> test with little or no variation. <u>See</u> <u>In re G.S.F. Corp.</u>, 938 F.2d 1467, 1475 (CA1 1991); <u>A.H. Robins Co. v. Piccinin</u>, 788 F.2d 994, 1002, n. 11 (CA4), cert. denied, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986); <u>In re Wood</u>, 825 F.2d 90, 93 (CA5 1987); <u>Robinson v. Michigan Consol. Gas Co.</u>, 918 F.2d 579, 583-584 (CA6 1990); <u>In re Dogpatch U.S.A., Inc.</u>, 810 F.2d 782, 786 (CA8 1987); <u>In re Fietz</u>, 852 F.2d 455, 457 (CA9 1988); <u>In re Gardner</u>, 913 F.2d 1515, 1518 (CA10 1990); <u>In re Lemco Gypsum, Inc.</u>, 910 F.2d 784, 788, and n. 19 (CA11 1990). The Second and Seventh Circuits, on the other hand, seem to have adopted a slightly different test. <u>See</u> <u>In re Turner</u>, 724 F.2d 338, 341 (CA2 1983); <u>In re Xonics, Inc.</u>, 813 F.2d 127, 131 (CA7 1987); <u>Home Ins. Co. v. Cooper & Cooper, Ltd.</u>, 889 F.2d 746, 749 (CA7 1989). But whatever test is used, these cases make clear that *bankruptcy courts have no jurisdiction over proceedings that have no effect on the estate of the debtor*.

514 U.S. 300, 308 n. 6 (emphasis added).

In the intervening years, the Fourth Circuit has affirmed the <u>Pacor</u> standard.  <u>See</u> <u>New Horizon of N.Y. LLC v. Jacobs</u>, 231 F.3d 143, 151 (4th Cir. 2000); <u>In re Celotex Corp.</u>, 124 F.3d at 626-27 (confirming that the Fourth Circuit "adopted the Third Circuit's test for determining the existence of 'related to' jurisdiction" and applying "the <u>Pacor</u> test").  So, too, has the Third Circuit.  <u>See</u> <u>In re W.R. Grace & Co.</u>, 591 F.3d 164, 173 (3rd Cir. 2009) ("Indeed, we have stated and restated that, in order for a bankruptcy court to have related-to jurisdiction to enjoin a lawsuit, that lawsuit must 'affect the bankruptcy [ ] without the intervention of yet another lawsuit.'") (quoting <u>In re Federal-Mogul Global, Inc.</u>, 300 F.3d at 382).

In <u>Pacor</u> itself, the Third Circuit acknowledged the importance of a contractual basis for indemnity to support "related to" jurisdiction.  Noting that a judgment against the potential indemnitee there, where there was no contractual indemnity, "could not give rise to any automatic liability on the part of the estate" without an intervening lawsuit, the <u>Pacor</u> court held the lower court lacked jurisdiction.  In doing so, the Third Circuit distinguished its decision from an earlier case, <u>In Re Brentano's</u>, in which the Southern District of New York had found "related to" jurisdiction based on a contractual

indemnity agreement.  See Pacor, 743 F.2d at 995 (discussing In Re Brentano's, 27 B.R. 90 (S.D.N.Y.1983)); see also A.H. Robins Co. v. Piccinin, 788 F.2d 994, 1000 (4th Cir. 1986) (observing that "[t]he clear implication of [Pacor] is that, if there had been a contract to indemnify, a contrary result would have been in order").  While the Fourth Circuit has also found "related to" jurisdiction based on indemnification, the presence of a contractual obligation of indemnity was decisive to that finding.  See In re Celotex Corp., 124 F.3d at 627.[1]

The defendant urges the court to find jurisdiction based on a broad reading of the scope of "related to" jurisdiction, relying on In re Dow Corning Corp., a case in which the Sixth Circuit adopted a broad interpretation of "related to" jurisdiction.  See 86 F.3d 482, 493-94 (6th Cir. 1996) ("Dow Corning").  In that case, the court held that even "contingent claims" for contribution or indemnification could conceivably impact Dow Corning's bankruptcy, giving rise to "related to" jurisdiction.  Id.  The case involved mass tort claims over silicone breast implants produced by Dow Corning and the non-debtor defendants.  Because the "nature of the claims asserted establishe[d] that Dow Corning and the various

---

[1] The Fourth Circuit's In re Celotex Corp. decision is unrelated to the above-quoted Supreme Court case involving the same entity.

13

nondebtor defendants [were] closely related with regard to the
pending breast implant litigation" and the non-debtor defendants
planned to assert claims for contribution and indemnification
against Dow Corning, the Sixth Circuit found that together the
thousands of claims at issue were "related to" Dow Corning's
bankruptcy.  Id.  The Dow Corning court explained its reasoning,
in part, as follows:

> Claims for indemnification and contribution,
> whether asserted against or by Dow Corning, obviously
> would affect the size of the estate and the length of
> time the bankruptcy proceedings will be pending, as well
> as Dow Corning's ability to resolve its liabilities and
> proceed with reorganization. In addition, we believe
> there is a qualitative difference between the single
> suit involved in Pacor and the overwhelming number of
> cases asserted against Dow Corning and the nondebtor
> defendants in this case. A single possible claim for
> indemnification or contribution simply does not
> represent the same kind of threat to a debtor's
> reorganization plan as that posed by the thousands of
> potential indemnification claims at issue here.

Id. at 494.

No such threat exists here where the Freedom plan that
has been confirmed is one of liquidation rather than
reorganization.  Determining the portion of any recovery by the
plaintiffs against WV American that would warrant the allowance
of a contribution claim against the bankruptcy estate would
require re-litigation of the components of the claim in order to
segregate out that for which Freedom may be held responsible.
The inability fairly to do so readily explains why West Virginia

14

state law requires that both parties, Freedom and WV American,
be joined in the same action so that allocation can therein be
made by the trier of fact.  See Jennings v. Farmers Mut. Ins.
Co., 687 S.E.2d 574, 578 (W. Va. 2009) ("If a tortfeasor is not
a part of the litigation — whether because of a settlement or
because the tortfeasor was not sued — our law is clear that no
contribution may be had from that tortfeasor").

Such joinder also allows segregation of those claims
affecting only one of the two.  Claims that WV American provided
adulterated water in violation of consumer protection laws or
that WV American negligently failed to take steps such as
planning for an alternative water supply in the event of a
chemical spill are distinct from claims against Freedom for the
spill itself and require proof of a separate set of facts and a
separate finding as to liability.

While the Dow Corning court was "[c]ognizant of the
fact that 'related to' jurisdiction cannot be limitless," id.,
it does not address where those limits lie.[2]  An expansive

─────────────

[2] Referencing Dow Corning's "pragmatic" approach, at least
one other court has recently addressed "related to" jurisdiction
based on contribution claims.  See In re New England Compounding
Pharm., Inc. Prods. Liab. Litig. 496 B.R. 256 (D. Mass. 2013).
The court began its analysis by finding that "related to"
jurisdiction existed, as indeed it does, over two categories of
cases; that is, cases in state and federal court in which (1)
the debtor or its affiliates had been sued or (2) non-debtor

approach is not consistent with Pacor or Fourth Circuit
authority adopting the Pacor standard.  WV American appears to
recognize this, insisting in its briefing that the "inchoate"
contribution claims it may bring against Freedom are nonetheless
not "contingent."  Defs.' Mem. In Opp'n ¶ 21.  The court is
unpersuaded.  Due to the factual differences between claims
against Freedom and those against WV American, the latter's
eventual entitlement to indemnification is indeed contingent.

The court concludes that the relationship of
plaintiffs' claims against WV American to the Freedom bankruptcy
is too attenuated to constitute "related to" jurisdiction under
Section 1334(b).  The court is thus not vested with subject
matter jurisdiction over those actions and will, by companion
order entered contemporaneously herewith, remand those actions
as and to the extent set forth therein.

B.   Abstention Respecting WV American

Even if the court were vested with subject matter

---

defendants had asserted third party contribution claims against
the debtor.  As to a third category, comprised of state court
cases in which a claim against the debtor or its affiliates was
"possible, but [had] not yet been asserted," it was merely
stated that "the Court will assume the existence of subject-
matter jurisdiction, but will abstain from exercising any such
jurisdiction."  496 B.R. at 269.

jurisdiction over claims against WV American, it would

necessarily consider abstaining under 28 U.S.C. § 1334(c), which

provides as follows:

> (c)(1) . . . [N]othing in this section prevents a
> district court in the interest of justice, or in the
> interest of comity with State courts or respect for
> State law, from abstaining from hearing a particular
> proceeding arising under title 11 or arising in or
> related to a case under title 11.

> (2) Upon timely motion of a party in a proceeding
> based upon a State law claim or State law cause of
> action, related to a case under title 11 but not
> arising under title 11 or arising in a case under
> title 11, with respect to which an action could not
> have been commenced in a court of the United States
> absent jurisdiction under this section, the district
> court shall abstain from hearing such proceeding if an
> action is commenced, and can be timely adjudicated, in
> a State forum of appropriate jurisdiction.

28 U.S.C. § 1334(c).  As the Supreme Court has noted, "the broad

grant of jurisdiction conferred by § 1334(b) is subject to a

mandatory abstention provision applicable to certain state-law

claims."  That is, as earlier noted, § 1334(b), which provides

original jurisdiction in the district courts for "related to"

claims, is subject to the mandatory abstention provision of §

1334(c)(2) with respect to a state law claim for which diversity

or federal question jurisdiction is absent.  Marshall v.

Marshall, 547 U.S. 293, 309 fn. 6 (2006).  Section 1334(c)(2) in

turn is qualified by 28 U.S.C. § 157(b)(4), that provides:

> (4) Non-core proceedings under section 157(b)(2)(B) of
> title 28, United States Code, shall not be subject to

the mandatory abstention provisions of section
1334(c)(2).

28 U.S.C. § 157(b)(4).  The referenced subsection, 157(b)(2)(B),

provides as follows:

(2) Core proceedings include, but are not limited to -

(B) allowance or disallowance of claims against the
estate or exemptions from property of the estate, and
estimation of claims or interests for the purposes of
confirming a plan under chapter 11, 12, or 13 of title
11 <u>but not the liquidation or estimation of contingent
or unliquidated personal injury tort or wrongful death
claims against the estate for purposes of distribution
in a case under title 11</u> . . . .

28 U.S.C. § 157(b)(2)(B) (emphasis added).

Respecting the claims and cases pending against WV

American, some of which are contractual rather than tortious,

the analysis begins with section 1334(c)(2).  First, plaintiffs

timely moved for remand.  Second, the claims asserted against WV

American rest entirely upon state law related to a case under

title 11.  Third, the plaintiffs could not have commenced this

action in federal court absent § 1334 inasmuch as the parties

are not diverse and no federal claims are alleged.  Finally,

there is no indication that the cases cannot be timely

adjudicated in state court.

The cases against WV American are subject to mandatory

abstention unless they qualify for the personal injury safe

harbor found in the <u>in</u> <u>pari</u> <u>materia</u> application of §§ 157(b)(4)

and 157(b)(2)(B).  An analysis of the statute is thus necessary.

There is a split of authority respecting whether the safe harbor reaches a nondebtor third party, such as WV American, as exemplified by the two cases that follow.  Compare In re New Eng. Compounding Pharm., Inc. Prods. Liab. Litig., 496 B.R. 256, 272 (D. Mass. 2013)(stating, "That in light of Congress's motivation for crafting the exception -- that 'the unpredictable and substantial verdicts that are often produced in personal injury tort and wrongful death claims could have potentially deleterious effects on a debtor's estate,' and the practical threat posed to the estate by contribution and indemnity claims in this case, the phrase 'personal injury tort or wrongful death claims against the estate,' as used in § 157(b)(2)(B), 'can fairly be read to encompass not only personal injury and wrongful death claims, but also claims for contribution or indemnity that derive from personal injury or wrongful death claims.'"), with Wingate v. Insight Health Corp., No. 7:13-00142, 2013 WL 1951897, at *5 (W.D. Va. May 10, 2013) (stating, "[T]he court abides by the plain language of the statute, finds that Ms. Wingate's claims are not 'against the estate' and therefore not subject to § 157's abstention-exception, and grants Ms. Wingate's motion for mandatory abstention.").

The court in New England Compounding acknowledged that
"A strict textual reading of the statutes may lead to the
conclusion that personal injury and wrongful death claims
asserted against non-debtor third parties . . . and not against
the bankruptcy estate, are subject to the mandatory abstention
provisions of § 1334(c)(2)." Id. at 271.  The court ultimately
concluded, however, that it was compelled to "interpret the
statutory language in the context of . . . [certain]
practicalities." Id. at 272.

That approach appears to be untethered from the plain
text of the statute.  Section 157(b)(2)(B) has limited reach,
only grasping "liquidation or estimation of contingent or
unliquidated personal injury tort or wrongful death claims
against the estate . . . ." Id. (emphasis added).  Plaintiffs'
claims against WV American do not qualify for the safe harbor
inasmuch as WV American is neither a debtor nor are its assets
held in a bankruptcy estate.

Accordingly, even if the court could exercise subject
matter jurisdiction--which it cannot for the reasons discussed
above--it would be required to abstain from doing so over
plaintiffs' claims against WV American.

C.    Abstention Respecting Freedom

        The court, cognizant of the automatic stay and the
injunction provisions of the confirmed plan and the Code, does
not at this time conduct the analysis as to Freedom inasmuch as
it appears unnecessary in any event.   In plaintiffs'
supplemental reply brief filed April 17, 2015, is found this
declaration:

> [WV American's] suggestion that remanding this case
> will result in state court litigation against Freedom
> is fanciful. The bankruptcy stay remains in effect, no
> party has moved to lift the stay, and there has been
> no suggestion that the bankruptcy court would approve
> such a request. None of the Plaintiffs joining in the
> consolidated remand motion intend to make such a
> request should these cases be remanded. The claims
> against Freedom will be resolved in the Bankruptcy
> Court – not in litigation in either this Court or
> State Court.

(Pls.' Supp. Reply at 3).

        With respect to those cases in which Freedom is named
as a party with WV American, the court will, by companion order
entered contemporaneously herewith, sever Freedom therefrom and
stay any proceedings against that debtor pending the further
order of the court, without abstention.   In those cases where
Freedom alone is named, the court will, by that same order, stay
the cases without abstention.   Once a discharge order has been
entered, the court would then entertain a proposed dismissal of
the claims or cases alleged against Freedom.

The Clerk is directed to send a copy of this written opinion and order to counsel of record and any unrepresented parties, along with Mark E Freedlander, Esq., McGuireWoods LLP, 625 Liberty Avenue, 23rd Floor, Pittsburgh, PA 15222.

DATED:    December 17, 2015

Judge John T. Copenhaver, Jr.
United States District Judge